TOWN OF SUDBURY *vs.* DEPARTMENT OF PUBLIC UTILITIES & another

(and three companion cases[1]).

Suffolk.    May 4, 1966. — June 24, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Public Utilities. Electricity. Electric Company. Equity Pleading and Practice,* Parties, Proceeding for review of decision of department of public utilities. *Municipal Corporations,* As representing the public interest. *State Administrative Procedure Act. Evidence,* Before the department of public utilities. *Eminent Domain,* Electric company. *Parks. Burial Place.*

In a suit by a town under G. L. c. 25, § 5, for review of the decision of the Department of Public Utilities in a proceeding by an electric company under c. 164, § 72, for authority to make takings by eminent domain in connection with a proposed transmission line to be located in such town, where it appeared that the town had been allowed to participate fully before the department but that its petition to intervene had been denied on the ground of a general order of the department that allowance of participation of a "political entity" in any proceeding should "not be construed as an admission by" the department that the participant was "a party in interest aggrieved by" action of the department, it was held that the town had been entitled to intervene before the department and had standing to maintain the suit for review.    [217–219]

No abuse of the wide discretion of the Department of Public Utilities or error appeared in sundry rulings on evidence by it in a proceeding by an electric company under G. L. c. 164, § 72, for authority to make takings by eminent domain in connection with a proposed transmission line.    [219]

The question of overhead or underground construction of an electric transmission line authorized in a proceeding under G. L. c. 164, § 72, by a decision of the Department of Public Utilities affirmed by this court on review under c. 25, § 5, did not appear to have been conclusively

---

[1] The companion cases are by town of Wayland, Harry C. Rice, and Sudbury Valley Trustees, Inc. (Valley), respectively, against the same respondents.

settled in favor of overhead construction in that proceeding, and, in a subsequent proceeding by the electric company under § 72 seeking authority to make takings by eminent domain in connection with the proposed line, such question and factors supporting underground construction were open to consideration by the department. [223]

Acquisition by an electric company pursuant to G. L. c. 164, § 72, of necessary rights in public ways and over public lands for a transmission line previously authorized by the Department of Public Utilities is not a prerequisite to an order by the department allowing the company to make takings by eminent domain in connection with the proposed line. [223–224]

In a proceeding under G. L. c. 164, § 72, by an electric company for authority to make takings by eminent domain in connection with a transmission line, it did not appear that the Department of Public Utilities was precluded from authorizing a taking of land of the Sudbury Valley Trustees, Inc. [225]

A certain tract of land which might have been the site of an ancient Indian village was not shown to have been a "burial ground" within G. L. c. 114, § 17, and taking of interests in the tract for the purposes of an electric transmission line was not precluded by that section. [225–226]

Under § 11 (5) of the State Administrative Procedure Act, G. L. c. 30A, it was proper for the Department of Public Utilities in an adjudicatory proceeding to evaluate evidence in the light of the department's specialized knowledge. [226–227]

Findings by the Department of Public Utilities on the principal issue before it in a proceeding, whether a proposed electric transmission line in a certain location should be constructed overhead or underground, could not, on the record, be said to be inadequate or unsupported by evidence; nor, on the record, was there prejudicial error in the refusal of certain requests for rulings on such issue. [227–230]

FOUR PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on January 11, 1965.

The cases were reserved and reported by *Spiegel, J.*

*Philip B. Buzzell* (*Joseph P. Warner* with him) for the Town of Sudbury & others; *Frank W. Kilburn, Jr.,* Town Counsel, for the Town of Wayland, also with him.

*Frank B. Frederick* (*Hervey W. King & James M. Carroll* with him) for the intervener, Boston Edison Company; *Peter Roth,* Assistant Attorney General, for the Department of Public Utilities, also with him.

WILKINS, C.J. These four petitions for appeal under G. L. c. 25, § 5, are from the decision, rulings, and order of the respondent department authorizing the respondent Boston Edison Company (Edison) upon its petition pursuant

to G. L. (Ter. Ed.) c. 164, § 72, to take by eminent domain certain lands, rights of way or other easements in the towns of Concord, Sudbury, and Wayland for the construction and use of a proposed overhead line or lines for the transmission of electricity. The petitioners for appeal are two of the towns and two of the owners of land authorized to be taken. The proposed line is approximately 7.5 miles long, of which approximately 5.5 miles are in Sudbury, 1.5 miles in Wayland, and 0.5 miles in Concord. It will run from Edison's substation in Sudbury to a proposed substation "to be located near the corner of the towns of Sudbury, Acton, Maynard and Concord." When completed it will become an integral part of the so called 110 KV "outer ring" which runs from Weymouth in a circle to the Mystic Station located in Everett and Boston.

The proposed right of way is 250 feet in width, and at the time of the hearing satisfactory rights had been obtained by negotiation for 56.75 per cent of the length of the line. In Concord rights in private property had been acquired for the entire length in that town; in Wayland for approximately 0.5 miles, leaving one mile to be acquired; and in Sudbury for approximately 3.0 miles, leaving 2.5 miles. Of the last mentioned amount less than 1,000 feet is in the residential zone, the balance falling in land designated as swamp or flood plain area. Under existing bylaws residential construction is prohibited in the flood plain area. Initial construction was the same as in the first stage hearing, and is to consist of wood pole H-frame structures spaced approximately twelve to the mile. Pole heights will vary from fifty-five to ninety-five feet. Each circuit will consist of three conductors. The minimum conductor to ground clearance is to be twenty-five feet.

The petition prays that Edison be authorized to construct and use the line and to take by eminent domain "such lands or such rights of way or other easements . . . along the route described as may be necessary as to all parcels as to which the same have not already been acquired, except public ways, public places, parks or reservations and lands

within the locations of any railroads, electric railroads or street railway companies.''

On a previous petition by Edison the department determined that ''the proposed line is necessary for the purposes alleged, will serve the public convenience and is consistent with the public interest.'' That decision was affirmed in *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428 (the first *Sudbury* case). It was there stated with reference to G. L. c. 164, § 72, and related sections of the statutes that there were three stages of procedure: (1) whether a transmission line will be authorized at all upon an initial petition under § 72; (2) whether any necessary eminent domain proceedings will be authorized; (3) and whether the department's authority under G. L. c. 166, § 28, as amended, will be exercised to overrule local refusals to grant locations across public ways. At p. 433, we said, ''[T]he department is in each instance exercising a separate function as to which, in the light of the competent evidence before it, it must make a determination. . . . [E]ach stage of the procedure is a separate proceeding and . . . in each such proceeding all relevant questions of the public convenience and necessity must be considered. . . . [T]he decision of the department at each stage is a final decision from which an appeal may be taken under c. 25, § 5, as amended.'' That case related to the first stage of the procedure, and the present case relates to the second.

In the county court four petitions of Edison to intervene as a party respondent were allowed.

The single justice reserved and reported the cases without decision upon the complete record before the department.

1. Before the department, the towns of Sudbury and Wayland each filed a petition for leave to intervene as a party in interest. These petitions were denied subject to the exceptions of the towns, which were nevertheless allowed to present evidence, examine and cross-examine witnesses, submit requests for rulings, and file briefs.

So far as appears, the towns of Sudbury and Wayland participated in the hearings as fully as though their peti-

tions had not been denied. Now, however, on appeal their status is contested on the ground that they are not parties. In somewhat similar circumstances in *Wilmington* v. *Department of Pub. Util.* 340 Mass. 432, 437, and in the first *Sudbury* case, we held that the towns had been impliedly allowed to intervene. Compare *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 136.

The decision of the department states there was no contention that the line was not necessary for the purpose alleged, and contains the following: "The primary efforts of the opposition were directed to the proposition that an overhead line in the general location proposed by the petitioner would not serve the public convenience and would not be consistent with the public interest and the reasons therefor were generally based on the alleged destruction of the aesthetic beauty of the countryside and the alleged devaluation of property."

To represent the public interest, municipalities are in a superior position to individuals. Actually, as stated in *Wilmington* v. *Department of Pub. Util., supra,* 438–439, in quoting with approval an argument of counsel, cities and towns are the only entities which can be expected to offer a real, practical, and adversary representation of the public interest. We there emphasized that this factor should have weight in the consideration by the department of applications to intervene; and that it will be viewed in its proper perspective by this court in reviewing the department's discretion.

The stated basis of the denial of the petitions to intervene was an order of the department dated November 9, 1959, which provides that "allowance . . . of the participation of any . . . political entity, in any proceeding . . . shall not be construed as an admission by the Department that such participant is a party in interest aggrieved by an order, ruling, finding or other action of the Department." The order is a defensive one, obviously aimed, as shown by the word "admission," at later proceedings to which the department is a party.

Denial on this ground lacks persuasion. A departmental order of general application and necessarily making no reference to the subject matter of the hearing amounts to a command to omit pro tanto the exercise of discretion. The substance of the order, as well as its phraseology, could spring from a purpose to choke off appeals by municipalities. In the present case that is its effect.

The order significantly was not relied upon during the first stage of this project. No distinguishing reasons have been offered why the towns should not now be parties as much as in the first stage.

By G. L. c. 30A, § 10, the department may allow one to intervene who is "substantially and specifically affected by the proceeding." The ground assigned for denying intervention did not show compliance with § 10. No other reason for the ruling was given. No exercise of discretion on this issue is apparent. On the record before us, each town was entitled to intervene and should now have standing to appeal as an "aggrieved party in interest." G. L. c. 25, § 5. We so hold.

Some aspect of this project has been pending before the department or in the courts since 1960. No useful purpose would be served in incurring further delay by recommittal to the department. No argument is made that the towns could have done more had they been admitted as parties. On the present petitions they have argued fully and at length both by brief and orally before us.

2. We now take up rulings of the hearing examiner on questions of evidence. No error, much less harmful error, is shown as to any of them. Length of our discussion is limited by the unimportance of their subject matter relative to the mass of evidence as a whole and by the practical need for keeping the opinion within reasonable length. There is a printed record of 124 pages, testimony of 649 pages in six volumes, and 33 exhibits. There are twenty-seven errors assigned by Sudbury, thirteen each by Wayland, Rice, and Valley.

At the outset, it should be borne in mind that the department has a wide discretion in ruling on evidence. It "need

not observe the rules of evidence observed by courts . . . .
Evidence may be admitted and given probative effect only
if it is the kind of evidence on which reasonable persons
are accustomed to rely in the conduct of serious affairs.
Agencies may exclude unduly repetitious evidence, whether
offered on direct examination or cross-examination of wit-
nesses.'' G. L. c. 30A, § 11 (2). ''[U]nless the admission
[or exclusion] of the evidence resulted in a denial . . . of
substantial justice,'' the appellants have no valid complaint.
*Mayor of Everett* v. *Superior Court,* 324 Mass. 144, 148.
*Leen* v. *Assessors of Boston,* 345 Mass. 494, 505–507. *Ham-
ilton* v. *Department of Pub. Util.* 346 Mass. 130, 146. G. L.
c. 30A, § 14 (8). Wigmore, Evidence (3d ed.) §§ 4a–4c,
pp. 25–27, 93. 29 Harv. L. Rev. 208, 210–211.

A general claim frequently expressed by the appellants
was that the department held to a pattern or policy of not
allowing sworn testimony as to damage to aesthetic beauty
and injury to property values. The entire record fairly
examined shows this claim to be unjustified. The trial ex-
aminer repeatedly admitted over Edison's objection testi-
mony as to the effect of the proposed line on the public
interest. A few examples of such testimony concern an
alternative route along existing railroad lines; effect on
property values of developed land within view of the line;
similar effect on unimproved land within view; present and
future land use along the line; the number of houses within
1,000 to 1,500 feet of the line. The examiner's frequent
answer in ruling upon Edison's objections was that the evi-
dence would be admitted for whatever value the department
might place upon it.

(a) Thomas L. Hughes, a civil engineer employed by
Edison, testified that he had negotiated for the purchase of
land from one Hawes. The cross-examination proceeded
with the purpose, as now contended, of showing that the
real reason for a diversion of the line into the town of Con-
cord, which added 1,500 feet to its length, was not to accom-
modate Hawes, but might have been to introduce a third
town with the possibility of a majority vote under G. L.

c. 166, § 28, as amended. This attempt to discredit the witness was a collateral matter within the trial examiner's discretion to exclude. The question also was objectionable in form. It was error to phrase the question as to whether the witness did "have . . . reason to think." Moreover, a responsive answer would have been immaterial.

(b) Allen H. Morgan, clerk and a director of the appellant Valley, was called as a witness by counsel for Sudbury. Certain alleged exclusions on direct examination are attacked. The precise questions and rulings could be clearer, and are not repeated verbatim in the briefs. He was interrogated as to land owned by Valley some of which was proposed to be taken and some of which was adjacent thereto. He was asked, "Do you have an opinion as to the effect on the public interest of this construction of this proposed overhead transmission line?" The question was excluded. The offer of proof was that "there would be serious damage to the public interest and the value of these areas for the public purposes [for] which the corporation holds them if the proposed overhead line is constructed." Counsel then said, "I will repeat that question with reference only to the parcel, the 14-acre parcel, a portion of which is in the line of march and proposed to be taken and I ask you the same question with respect to that." The trial examiner stated that "the department has no jurisdiction over damages." The final ruling was that the witness would be allowed to testify subject "to either acceptance or rejection" by the trial examiner's counsel. This, in substance, was admitting the evidence de bene. The witness answered, "Yes, I have an opinion. I believe it would damage the purpose for which we hold it. The public interest would be damaged." There was no later ruling, and, contrary to the appellants' contention, the evidence was in for all purposes. See *Putnam* v. *Harris,* 193 Mass. 58, 61–62; *Commonwealth* v. *Johnson,* 199 Mass. 55, 59; *Clarke* v. *Fall River,* 219 Mass. 580, 586; *Commonwealth* v. *Demboski,* 283 Mass. 315, 320; Annotation, 88 A. L. R. 2d 12, 108–121. In so far as evidence may have been excluded as

to adjacent parcels this was a matter of discretion. The appellants have shown neither error nor harm in this confused bit of testimony.

(c) Charles E. Downe, a planning consultant called by Sudbury, was asked on direct examination, "In connection with your experience in planning and consulting in various communities do you have any opinion as to the importance, from the point of view of the public, of an area such as is comprised in this so-called Sudbury valley marshes?" This was excluded. The offer of proof was, in substance, that the answer would be in the affirmative. A similar question was, "[D]o you have an opinion as to the general effect on the amenities of the town and the long range welfare of the town, the public welfare, of a construction of an overhead high power tension line, a high power transmission line of the type proposed in these proceedings?" He answered in the affirmative. He was then asked, "What is that opinion?" This question was excluded. The offer of proof was that the public amenities would be seriously and adversely affected. Due to the imprecision of the questions and the general character of the offers of proof, we are not persuaded that their exclusion was a denial of substantial justice. The offers were much less definite than the testimony admitted as to the effect of the proposed line on the public interest referred to above.

Also excluded was a question asking for what reason in his recommended land use, as appears in one of the exhibits, he showed this area for residential development in lots of two acres and one acre. The offer of proof was that the areas in the vicinity of the power line were particularly suited for so called low density large lot developments of more expensive homes. The matter had been covered previously by another expert called by the respondents. See G. L. c. 30A, § 11 (2). It was within the trial examiner's discretion to exclude it. That Downe had made these recommendations was in evidence. His reasons would have added nothing of real value.

(d) Roger F. Pownall, superintendent of electric transmission of the New Haven Railroad, was called as a witness

by Sudbury. Two questions on direct examination were excluded. They were entirely immaterial and hardly merit discussion. One question was whether to the personal knowledge of the witness the railroad would grant an underground easement. The other was the charges made by the railroad for oil pipe lines installed in its right of way.

(e) Francis M. Staszesky, engineer employed by Edison, was called as a witness by Edison. Several exceptions of Sudbury are discussed together in the appellants' brief. They criticise his qualifications to some extent and the supposed absence of proper basis for his testimony. Detailed discussion of these exceptions would not be helpful. The criticisms at most go merely to the weight of the evidence.

3. Edison makes the argument that the decree of this court in the first *Sudbury* case settled once and for all the overhead-underground question in favor of the overhead line. It points out that the proposed line was described in the initial petition as an overhead line; that evidence bearing on the issue was introduced; that approval of the overhead line was embraced in the order of the department; that the town of Sudbury, which appealed, did not appeal on this ground; and that the decree of this court affirmed the decision of the department. This argument overlooks the fact that the department considered only in the most general terms the possibility of underground construction in the first *Sudbury* case as contrasted with the detailed consideration of a specific underground route and detailed analysis of its cost in the hearing below.

It was not error for the department to consider the overhead-underground question and issues of injury to aesthetic beauty and property values in a second stage proceeding. See *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 142. See also *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428, 433, n. 4.

4. The appellants assert that it was error to grant rights to take land by eminent domain for a proposed route which would have to cross public streets in three towns, as well as railroad lines and public parks or reservations,

without evidence that permission to make such crossings, or to transmit electricity over them, had been, or could be, obtained, as required by G. L. c. 164, § 72. The material part of § 72 follows: "No lands or rights of way or other easements therein shall be taken by eminent domain under the provisions of this section in any public way, public place, park or reservation, or within the location of any railroad, electric railroad or street railway company except with the consent of such company and on such terms and conditions as it may impose; and no electricity shall be transmitted over any land, right of way or other easement taken by eminent domain as herein provided until the electric company shall have acquired from the board of aldermen or selectmen or from such other authorities as may have jurisdiction all necessary rights in the public ways or public places in the town or towns, or in any park or reservation, through which the line will or does pass."

The quoted provision does not prescribe that performance in accordance with its mandate shall precede exercise of the right of eminent domain. As was said in the first *Sudbury* case (p. 432), "The section does not purport to prohibit construction upon land which the company owns or over which it has a right of way until the local or other authorities have given the necessary rights in public lands or ways"; and again (p. 434), "Section 72 no longer . . . makes proof of acquisition of certain rights in public ways and over other lands a prerequisite even to the granting of an order for a taking by eminent domain. Such a showing, and findings based thereon, are also not prerequisites . . . to a determination that a line is necessary, that it will serve the public convenience, and is consistent with the public interest."

Obviously, all acts which must be performed before a transmission line can be constructed cannot be performed simultaneously. If Edison wishes to take what the appellants in their brief describe as a "risky gamble," nothing prevents it. Neither does anything deprive the department of jurisdiction in a second stage proceeding. There was no error in the slightest respect contended.

The appellants do not mention that the fifth request of the town of Sudbury was granted.[1] Such evidence was admitted. The appellants' argument lacks authority.

5. The appellants argue that because of G. L. c. 164, § 72, quoted above, the easement in land owned by Valley cannot be taken by eminent domain because it is a "public place, park or reservation." Those words in § 72, however, apply to lands only "until the electric company shall have acquired from the board of aldermen or selectmen or from such other authorities as may have jurisdiction all necessary rights . . . in any park or reservation, through which the line will or does pass." The Valley trustees are not public authorities ejusdem generis with boards of aldermen or selectmen. *Babcock Davis Corp.* v. *Paine,* 240 Mass. 438, 440-441. *Crown Shade & Screen Co.* v. *Karlburg,* 332 Mass. 229, 230-231. *Opinion of the Justices,* 337 Mass. 777, 782.

The appellants' eighth request was properly denied. Edison's fifteenth request was properly granted.

6. The appellants contend that land of the appellant Rice, in which Edison seeks to take an easement, is within G. L. (Ter. Ed.) c. 114, § 17, which provides, "A town shall not alienate or appropriate to any other use than that of a burial ground, any tract of land which has been for more than one hundred years used as a burial place; and no portion of such burial ground shall be taken for public use without special authority from the general court."

In its decision the department stated that there was evidence that a large number of Indian artifacts were discovered on the premises showing the existence of a permanent Indian settlement. Because of the size of the site and the expense, the site was never explored, but an Indian, whose bones were covered with red paint or red ochre before

---

[1] "5. Upon the pending petition under G. L. (Ter. Ed.) Chap. 164, Sec. 72, for authority to make takings by eminent domain for the purpose of a transmission line, the question as to whether necessary grants of rights in public ways and lands have been obtained, or if not, the reasons therefor, have a bearing upon the aspects of the public interest which the Department is bound to consider, and evidence relating thereto should be received if offered."

burial, was removed from the ground in 1931 or 1932. There was testimony that the coloring of the bones was one of the burial ceremonies. One Smith, a former president of the Massachusetts Archaeological Society, testified that the utensils and implements unearthed indicated a large, permanent Indian village of extreme age, and that "there will be and are undoubtedly other skeletons scattered here and there throughout the site and until it is properly and scientifically dug, no man can say where they are or how many there are but I am positive from my experience in the valley . . . that [it] is an important Indian burial site and should remain untouched."

The department concluded that the remains of one human being and the possibility of others scattered throughout the area were not, in its opinion, a basis for designating the land as a burial ground within c. 114, § 17, which "plainly refers to a tract of land definable and readily identifiable as a burying ground." The department inferred from Smith's testimony that "Indian burial was random in nature." The decision further stated, "There is certainly no evidence of an area or tract of land specifically defined as such."

The department's finding was clearly right. Because the facts are unusual we have stated them at greater length than the issue of law merits. There was no error in granting Edison's requests 13 and 14.[1] The request of the appellants, number 13,[2] was granted.

7. There is a contention by the appellants that certain findings of the department were based upon its own knowl-

---

[1] "13. The evidence which was introduced at the hearings that a portion of one of the parcels of land in which the Company seeks authority to take easements by eminent domain had been the site of an old Indian settlement did not warrant a finding that that tract of land has been used as a burial place for more than one hundred years. 14. General Laws, Chapter 114, Section 17, does not prohibit the Department from authorizing the Company to take by eminent domain transmission line easements in the parcel or tract of land as to which there was some evidence that it had been the site of an old Indian settlement."

[2] "If a portion of the proposed location for the transmission line includes a tract of land which has been for more than a hundred years used as a burial place, authority to take such tract by eminent domain cannot be granted in this proceeding without special authority from the General Court."

edge and upon its own findings in other proceedings not in evidence in these proceedings.

The State Administrative Procedure Act, G. L. c. 30A, § 11 (5), inserted by St. 1954, c. 681, § 1, provides: "Agencies may take notice of any fact which may be judicially noticed by the courts, and in addition, may take notice of general, technical or scientific facts within their specialized knowledge. Parties shall be notified of the material so noticed, and they shall be afforded an opportunity to contest the facts so noticed. Agencies may utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to them."

The appellants undertake to enumerate the findings of which they complain in this respect. Most of them relate to the need for or the cost of particular items. We shall not unreasonably enlarge this opinion by a specific, detailed analysis of these findings. In each instance a study of the testimony and of the decision shows the appellants' charge to be unfounded. In most, if not all, respects there was evidence presented by both Edison and the appellants as to the items. It was in the light of the department's specialized knowledge that specific evidence was evaluated. This was precisely as authorized by § 11 (5). *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 137. There is nothing to the contrary in the cases cited by the appellants. See *American Employers' Ins. Co.* v. *Commissioner of Ins.* 298 Mass. 161; *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 721.

This argument of the appellants, while perhaps abstractly correct, has no application to the actual facts.

8. Manifold broad and, as we think, unfounded attacks are made by the appellants upon the findings as inadequate. We shall try to consider them to the extent that they are argued with particularity.

(a) The appellants' brief states that the great bulk of the decision deals with the matter of comparative costs, and that by contrast the only references to considerations of general welfare, aesthetic considerations, and effect on property values are brief.

We quote material findings: "We cannot emphasize too strongly that there is no benefit to be derived by the ultimate user of electricity by placing the line underground. It neither improves his service nor adds to the continuity and indeed may work to his detriment. Of even greater importance is the fact that the company derives no additional revenue from an underground installation to offset the additional annual fixed charges. The only manner in which the necessary revenue may be obtained is by an increase in the existing rates charged for electricity. It is time that we faced the issue of underground versus overhead lines squarely. With the rapidly diminishing amounts of lands available for residential and recreational purposes, the objections by the public to overhead lines are understandable. . . . The desire to preserve aesthetic value, however, must be balanced against the cold hard fact of economics."

"Against the substantial interest of the public in an adequate supply of economically priced electric power, we must weigh the possible injury to inhabitants along the line. The preponderance of the opposition is from residents of Sudbury. The testimony indicates that the power line would be visible in varying degrees from only fifty out of 2054 residences in the town. There was some testimony that these residences would depreciate in value if an overhead line were constructed but the testimony was given by a witness who appeared to have no experience regarding the effect of power lines on residential values. Even giving substantial credence to his testimony, however, we find that the damage to these residences would not be substantial in relation to the public benefit to be derived from its construction."

The findings reflect in marked degree the department's concern with the public interest in that the additional cost of underground installation would fall upon consumers in general and would not be confined to consumers in Sudbury, where the decision states that most of the opposition is, and in Wayland.

The department found that the cost of placing lines un-

derground was 3.2 times the cost of overhead installation, and would require an additional investment of $2,248,897. The carrying charges exclusive of operating costs would be approximately $337,334 annually. These findings are far beyond "greatly increased costs" which was found insufficient as a finding in *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 144.

But the appellants object that there is no finding as to what, if any, increase in rates would result, and that "[f]or all that appears, such increase might be minimal or non-existent." This contention is both incorrect and unreasonable.

There is no requirement that the department's decision shall be of any particular length. Consistently with compliance with G. L. c. 30A, the content of its decision is primarily for it to decide. It would be unreasonable to expect findings on every point counsel would wish.

(b) The appellants assert that the department made "the wholly unwarranted assumption" that an order requiring underground installation would necessarily require similar orders in all future cases, and that "the foundation of the decision and order on such a premise is [an] error of law." We disagree with this argument. Such an assumption was not the foundation of the department's decision nor was it a prediction that future cases would not be decided on their merits.

9. The appellants object that there was error in denying their requests numbered nine, ten, and eleven. As to this, they state in their brief: "These requests respectively stated the proposition that, even if the cost of underground construction were found to be nearly or approximately twice, or three times, or even four times the cost of overhead construction, it would nevertheless be incumbent on the Department to consider evidence of adverse effects on the general welfare and property values resulting from overhead construction, and that the Department might, if it found that such adverse effects outweighed considerations of cost, direct the line to be placed underground." There was no error. The appellants' argument, which we

do not repeat, ignores the facts actually found by the department relating to general welfare and property values. Furthermore, the department granted their requests numbered six and seven.[1] See *Gibbons* v. *Denoncourt*, 297 Mass. 448, 458.

10. Examination of the transcript and the exhibits demonstrates that the subsidiary findings of the department are supported at the very least by "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, §§ 1 (6), 14 (8) (e).

The decision concludes: "We have arrived at our decision only after a most careful consideration of all the evidence and a thorough and exhaustive study of both the petitioner's route and the opposition's proposed routes. Both routes have been carefully traversed by the entire Commission and due consideration has been given to all aspects inherent in both routes."

We are satisfied that the department did make clear and detailed findings and reported enough of the evidence on which those findings were based to show that it weighed all the factors, and to enable us to determine that its decision, apart from the intervention of the towns, was free from error of law. G. L. c. 30A, § 14 (8). *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 545. *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 137. *New York Cent. R.R.* v. *Department of Pub. Util.* 347 Mass. 586, 592–593.

11. A final decree is to be entered in each case affirming the order of the department.

*So ordered.*

[1] "6. Upon the pending petition under G. L. (Ter. Ed.) Chap. 164, Sec. 72, for authority to make takings by eminent domain for the purpose of a transmission line, the questions, whether the proposed line, because of its unsightliness and the wide taking required would adversely affect the town, its general welfare, and taxable values of property therein, have a bearing upon the aspects of the public interest and convenience which the Department is bound to consider, and evidence relating thereto should be received if offered. 7. Upon the pending petition under G. L. (Ter. Ed.) Chap. 164, Sec. 72, for authority to make takings by eminent domain for the purposes of a transmission line, the question as to the comparative costs of construction underground as opposed to overhead is material and relevant to the issues and must be weighed against the public interests involved, and the excess cost, if any, of underground construction may be found to be warranted in view of adverse effects upon the general welfare and property values caused by overhead structures."